UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIAN RUBINSTEIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, CREDIT SUISSE SECURITIES (USA) LLC, TIDJANE THIAM, DAVID R. MATHERS, JANUS HENDERSON GROUP PLC, JANUS INDEX & CALCULATION SERVICES LLC, and JANUS DISTRIBUTORS LLC,<br><br>Defendants. | Civil Action No._____<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Julian Rubinstein ("plaintiff") alleges the following based upon personal knowledge and belief as to his own acts, and, as to the rest, based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission (the "SEC") filings of Credit Suisse Group AG and Credit Suisse AG (together, "Credit Suisse"), press releases, and analyst reports, media reports and other publicly disclosed reports and information about Credit Suisse and the VelocityShares Daily Inverse VIX Medium-Term ("ZIV") exchange traded note ("ETN"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons who purchased or otherwise acquired ZIV ETNs between June 30, 2017 and February 5, 2018 (the "Class Period"), seeking remedies under the Securities Act of 1933 (the "1933 Act") (15 U.S.C. §77k), and the Securities Exchange Act of 1934 (the "1934 Act") (15 U.S.C. §78(j), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

## JURISDICTION AND VENUE

2.      The claims alleged herein arise under §§11 and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§77k and 77o, and §§9, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§78i, 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act, and §27 of the 1934 Act.

4.      Venue is proper in this District pursuant to §22 of the 1933 Act, §27 of the 1934 Act, and 28 U.S.C. §1391(b). Many of the acts charged herein, including the dissemination of

materially false and misleading information, occurred in substantial part in this District.  ZIV is listed and trades on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "ZIV" in this District.

5.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but  not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Julian Rubinstein purchased ZIV ETNs during the Class Period pursuant to the Registration Statement (defined below), as set forth in the accompanying certification incorporated herein by reference, and has been damaged thereby.

**Credit Suisse Defendants**

7.      Defendant Credit Suisse Group AG is a Swiss multinational financial service holding company with its headquarters in Zurich, Switzerland.  It owns 100% of the equity interest in Defendant Credit Suisse AG, its primary operating subsidiary.

8.      Defendant Credit Suisse AG is the direct bank subsidiary of Credit Suisse Group AG and is domiciled in Zurich, Switzerland.  Credit Suisse AG issued the ZIV ETNs, for which it received millions of dollars in offering proceeds.  Because Credit Suisse Group AG and Credit Suisse AG are, as a practical matter, synonymous, both entities are referred to herein as "Credit Suisse."

9.      Credit Suisse International ("CSI") is a subsidiary of Credit Suisse AG that is domiciled in London, United Kingdom.  As of December 31, 2018, Credit Suisse AG and Credit Suisse Group AG hold 98% and 2% of the voting rights and a 98% and 2% of the equity interest in CSI, respectively.  CSI is one of four "major" subsidiaries of Credit Suisse that "account for a

significant portion of [Credit Suisse]'s business operations."  CSI, together with defendant Janus Index & Calculation Services LLC, served as the Calculation Agent for the ZIV.

10.     Defendant Credit Suisse Securities (USA) LLC ("CSSU") is a United States-based broker-deal for Credit Suisse, headquartered in New York, New York.  Its equity is 100% owned by Credit Suisse.  CSSU served as a an underwriter and placement and redemption agent for the ZIV for which it received certain fees and commissions.

11.     Defendant Tidjane Thiam has served as the CEO of Credit Suisse and as a member of the Executive Board at Credit Suisse since 2015.

12.     Defendant David R. Mathers has served as the CFO of Credit Suisse and a member of the Executive Board since 2010.  Mathers also serves as CEO of CSI.

13.     Defendants Thiam and Mathers together are referred to herein as the "Individual Defendants."  The Individual Defendants, in part because of their positions with Credit Suisse and CSI, possessed the power and authority to control the contents of Credit Suisse's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and investors, *i.e.,* the market.  Each Individual Defendant made or controlled the public statements alleged herein to be false or misleading, and had the ability and opportunity to prevent those statements from being disseminated to the market or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.

14.     Credit Suisse, CSI, CSSU, Thiam, and Mathers are collectively the "Credit Suisse Defendants."

3

**Janus Defendants**

15.    Defendant Janus Henderson Group plc ("Janus") is a global asset management holding company based in London, United Kingdom.  Janus owns VelocityShares LLC ("VelocityShares"), a Connecticut-based asset manager which was subsequently renamed Janus Index & Calculation Services LLC ("JIC").  Following a merger with Henderson Group in May 2017, Janus completed the acquisitions of these relevant controlled entities: VS Holdings Inc., JIC, and Janus Distributors LLC.  In 2017, Janus Distributors LLC began doing business as Janus Henderson Distributors ("JHD").

16.    Defendant Janus Index & Calculation Services LLC ("JIC") is Delaware limited liability company.  JIC is 100% owned by Janus Henderson Group plc.  Prior to July 2015, JIC was known as Velocity Index & Calculation Services. JIC, through VelocityShares, created the ZIV.  In addition, JIC served as the calculation agent for the ZIV, together with defendant CSI.

17.    Defendant Janus Distributors LLC is a Delaware limited liability company doing business as Janus Henderson Distributors ("JHD").  JHD is 100% owned by Janus Henderson Group plc.  Prior to July 2015, Janus Distributors LLC was known as Velocity Index & Calculation Services.  JHD received all or a portion of the Daily Investor Fee in consideration for its role in marketing and placing ZIV ETNs.

18.    Janus, JIC, and JHD are collectively the "Janus Defendants."

## SUBSTANTIVE ALLEGATIONS

19.    The Standard & Poor's 500 Index ("S&P 500 Index") is a capitalization-weighted index tracking the performance of 500 large market capitalization companies based on the total market value of their outstanding shares.

20.    Put and call options on the S&P 500 Index ("SPX options") are financial derivatives created and made available to investors on the Chicago Board Options Exchange,

Incorporated ("CBOE") to bet on a downward or upward move in the level of the S&P 500 Index.

21.     In 1993, the CBOE created a measurement of the market expectations of near-term volatility conveyed by SPX options prices, the CBOE Volatility Index ("VIX Index"). The VIX (often referred to as a "fear index" or "fear gauge") is an index used as a popular measure of market volatility. Although the index itself does not trade, many securities are tied to the value of the VIX.  Chicago Board Options Exchange describes the VIX as follows:

> The Cboe Volatility Index® (VIX® Index) is a leading measure of market expectations of near-term volatility conveyed by S&P 500 Index (SPX) option prices.  With the introduction of the VIX® Index in 1993, followed by the launch of trading of VIX futures at Cboe Futures Exchange (CFE) in 2004 and VIX options at Cboe in 2006, there has been a growing acceptance of trading VIX and VIX-linked products as risk management tools.

22.     CBOE calculates the VIX Index based on the real time pricing of SPX option contracts by averaging the weighted prices of such options over a wide range of strike prices.

23.     Futures contracts on the VIX Index ("VIX Futures") were created and made available to investors for them to invest in forward volatility based on their assessment of the future movements of the VIX Index.

24.     ETNs are unsecured debt obligations of financial institutions with return based on the performance of an underlying index. Inverse ETNs are similar instruments, but their value is calculated using the inverse of the performance of the underlying index.

25.     Credit Suisse was one of the largest issuers of inverse volatility-linked ETNs during the Class Period.  In addition to the ZIV, Credit Suisse issued the VelocityShares Daily Inverse VIX Short Term ("XIV") ETN (together with the ZIV, the "Inverse ETNs").  The performances of both the ZIV and the XIV were determined by reference to a volatility-linked index.  However, while the performance of XIV ETNs was based on the inverse performance of

*short-term* VIX Futures (as measured by the S&P 500 VIX Short-Term Futures Index),  the performance of ZIV ETNs was based on the performance of ***medium-term*** VIX Futures (as measured by the S&P 500 VIX Mid-Term Futures Index).

26.     The S&P 500 VIX Short-Term Futures Index (ticker "SPVIXSTR") created by S&P Dow Jones Indices LLC, utilizes prices of the next two near-term VIX Futures to replicate a position that rolls the nearest month VIX Futures to the next month on a daily basis in equal fractional amounts. This results in a constant one-month rolling long position in  first and second month VIX Futures.  XIV ETNs provide holders inverse exposure linked to the S&P 500 VIX Short-Term futures.  XIV ETNs are structured to increase in value when the S&P VIX Short-Term futures decline in value, and vice-versa.

27.     Similarly, the S&P 500 VIX Mid-Term Futures Index (ticker "SPVIXMTR") created by S&P Dow Jones Indices LLC, seeks to measure the return of a daily rolling long position in the fourth, fifth, sixth and seventh month VIX Futures.  ZIV ETNs provide holders inverse exposure linked to the S&P 500 VIX Mid-Term futures.  Like the XIV, the ZIV ETNs are structured to increase in value when the S&P VIX Mid-Term futures decline in value, and vice-versa.  Because the underlying index for the ZIV was based on volatility markets linked to the index underlying the XIV, the performance of the ZIV was linked to the performance of the XIV.

28.     The Inverse ETNs trade on the NASDAQ in three sessions: (i) the pre-market session from 4:00 a.m. to 9:30 a.m., (ii) the regular market session from 9:30 a.m. to 4:00 p.m., and (iii) the aftermarket session from 4:00 p.m. to 8:00 p.m. (all eastern standard time).

29.     During at least three brief occasions during the last ten years, market volatility spiked significantly.  During these brief volatility spikes, VIX Futures prices spiked at the end of

the trading day in a manner disproportionate to what would normally be expected.  These large price movements were caused in part by Credit Suisse and other volatility-related exchange-traded product ("ETP") issuers placing hedging trades to protect their balance sheets, *e.g.* buying VIX Futures to offset the risk posed by the Inverse ETNs they issued, or engaging in daily rebalancing of the ETPs to maintain appropriate leverage amounts.

30.     Credit Suisse, for instance, engaged in such hedging purportedly to protect itself in the event an Inverse ETN investor sought to redeem his or her Inverse ETNs, since Credit Suisse was obligated to pay the investor the value of the notes.  Credit Suisse did so in part  by holding short positions in VIX Futures, so that when VIX Futures prices dropped, Credit Suisse made money from the short positions, which in turn offset the resulting higher XIV and ZIV prices, and thus higher redemption values, that Credit Suisse was required to pay XIV and ZIV investors who wanted to redeem their notes. In addition, Credit Suisse engaged in proprietary trading in volatility financial products for its own account and the accounts of its clients. Throughout the Class Period, Credit Suisse transacted in a significant amount of volatility financial products, including, but not limited to VIX Futures contracts.

31.     Throughout the Class Period, the markets experienced a period of historically low volatility.  At the same time, investors poured into short volatility products such as the Inverse ETNs. For example, by January 26, 2018, Credit Suisse had sold approximately 10.8 million XIV ETNs worth approximately $1.5 billion, up from approximately 8.6 million XIV ETNs as of March 13, 2017, a 26% increase in less than a year.  Hundreds of millions of dollars were invested in other similarly short volatility ETPs, such as the ZIV. The proliferation of volatility-related products that relied on dynamic trading in the same VIX Futures and SPX option markets – in particular inverse and leveraged ETPs – created an acute liquidity risk that ensured that the

Inverse ETNs would not perform as advertised in the face of significant market turbulence.  In particular, due to the growth of the volatility ETP market, and particularly due to the massive growth in the value and number of Inverse ETNs, there were not enough VIX Futures available to trade which exposed the Inverse ETNs to extreme risks of suffering catastrophic losses in the event of market turbulence.

32.     In addition, Credit Suisse was highly incentivized to drive the value of the Inverse ETNs as close to zero as possible, as it was obligated to pay out the indicative value of the notes, calculated by reference to the underlying index, upon redemption.  As stated in the Registration Statement, "If the Final Indicative Value is zero, the Maturity Redemption Amount will be zero." Thus, if Credit Suisse could drive down the indicative value of the Inverse ETNs it could eliminate some or all of its related redemption liabilities, while at the same time retaining the proceeds from the offer and sale of the notes.  Credit Suisse designed the Inverse ETNs to allow it to take advantage of the acute liquidity risks that existed in VIX Futures markets and to precipitate the collapse of the Inverse ETNs in order to rid it of hundreds of millions of dollars in redemption liabilities.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

33.     The Class Period begins on June 30, 2017, when Credit Suisse filed a prospectus supplement with the SEC on Form 424B2 for the offer and sale of the Inverse ETNs, which incorporated and formed part of an F-3 registration statement, and was subsequently amended by a prospectus supplement filed on January 29, 2018 (together, the "Registration Statement"). The Registration Statement was signed by defendants Thiam and Mathers.

34.     The Registration Statement represented that the Inverse ETNs were "intended to be [a] trading tool[] for sophisticated investors to manage daily trading risks."  Similarly, the

Registration Statement stated that the XIV was "designed to achieve [its] stated investment objectives on a daily basis."  Indeed, the Registration Statement represented that the XIV was suitable for a wide-range of investor objectives.  It stated in pertinent part:

The ETNs may be a suitable investment for you if:

• You seek an investment with a return linked to the performance of the applicable underlying Index.

• You are willing to accept the risk of fluctuations in volatility in general and in the level of the applicable underlying Index in particular.

• You are a sophisticated investor seeking to manage daily trading risk using a short-term investment, and are knowledgeable and understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable.

• You believe the level of the applicable underlying Index will increase (if you invest in the Long ETNs or 2x Long ETNs) or decline (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment during the time you hold the ETNs.

• You do not seek current income from this investment.

• You do not seek a guaranteed return of your initial investment.

• You are a sophisticated investor using the ETNs to manage daily trading risks and you understand that the ETNs are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives.

• You understand that the Daily Investor Fees and the Early Redemption Charge will reduce your return (or increase your loss, as applicable) on your investment.

35.    In addition, the Registration Statement stated the following with regards to Credit Suisse's trading activity:

**Trading and other transactions by us, our affiliates, or third parties with whom we transact, in securities or financial instruments related to the ETNs and the applicable underlying Index may impair the value of your ETNs**

We expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures

9

contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or other instruments linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, and adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and to unwind the hedge by selling any of the foregoing, perhaps on or before the applicable Valuation Date. We, our affiliates, or third parties with whom we transact, may also enter into, adjust and unwind hedging transactions relating to other securities whose returns are linked to the applicable underlying Index. Any of these hedging activities may adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and therefore the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. It is possible that we, our affiliates, or third parties with whom we transact could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero. Any profit in connection with such hedging activities will be in addition to any other compensation that and our affiliates receive for the sale of the ETNs, which may create an additional incentive to sell the ETNs to you.

We, our affiliates, or third parties with whom we transact may also engage in trading in the underlying futures, or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or instruments whose returns are linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures for our or their proprietary accounts, for other accounts under our or their management or to facilitate transactions, including block transactions, on behalf of customers. Any of these activities could adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. We may also issue, and we, our affiliates, or third parties with whom we transact may also issue or underwrite, other ETNs or financial or derivative instruments with returns linked to changes in the level of the applicable

underlying Index or the underlying futures or listed or over-thecounter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. By introducing competing products into the marketplace in this manner, we, our affiliates, or third parties with whom we transact could adversely affect the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

36.     The Registration Statement also stated:

***There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents***

*       *       *

As noted above, we, our affiliates, or third parties with whom we transact, including [JHD], may engage in trading activities related to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other instruments linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. ***These trading activities may present a conflict between your interest in your ETNs and the interests we, our affiliates, or third parties with whom we transact, including [JHD], will have in our or their proprietary accounts, in facilitating transactions, including block trades, for our or their customers and in accounts under our or their management. These trading activities, if they influence the level of the applicable underlying Index, could be adverse to your interests as a beneficial owner of your ETNs***.

(Emphasis added).

37.     The statements in paragraphs ¶¶34-36 above were materially false and/or misleading because they misrepresented and failed to disclose the following material adverse facts: (i) that the Inverse ETNs were not appropriate for managing daily trading risks, as they could lose a substantial portion of their value in a matter of minutes; (ii) Credit Suisse had designed the Inverse ETNs to fail; (iii) Credit Suisse had offered and sold more of the Inverse ETNs than the market could bear so as to allow Credit Suisse to cause the collapse of the Inverse ETNs when the opportunity presented itself; (iv) Credit Suisse would actively manipulate

11

Inverse ETNs by precipitating an acute liquidity event in volatility markets, including markets for VIX Futures; and (v) as a result of the foregoing, defendants' statements about Inverse ETNs were false and misleading and/or lacked a reasonable basis.

**The Inverse ETNs Suffer Significant Losses**

38.     On February 5, 2018, the stock market declined, with the S&P 500 Index dropping 4%.  This market turbulence was a relatively modest by historical standards, but caused an outsized disruption in the volatility markets underlying the indexes for the Inverse ETNs.  Just days previously, defendants had offered an additional 16.275 million XIV notes and 2.9 million ZIV notes.  This offering had significantly exacerbated liquidity problems in already constrained VIX Futures markets.

39.     Knowing of the previous liquidity issues and that other participants in the VIX-related ETP market would be seeking to hedge their positions by buying VIX futures, Credit Suisse executed its plan to rid itself of XIV while making hundreds of millions of dollars at investors' expense and blaming the collapse on market forces.  Credit Suisse bought up thousands of February and March VIX futures contracts, drastically reducing their supply, and as a result drastically driving up the price of the contracts.  Between 4:00 p.m. and 4:15 p.m., February VIX futures prices went from $23.10 to $33.20, and March VIX futures prices went from $18.90 to $27.95, a spike of 43.72% and 47.88% respectively.

40.     That Credit Suisse was a primary mover of this spike is supported by its own admission the following day that it faced "no material impact" from the Inverse ETNs because, as the issuer of Inverse ETNs, "we hedge the risk … by trading VIX futures."  Importantly, as stated in the Registration Statement, Credit Suisse used "hedging" with respect to the Inverse ETNs to include the receipt of "substantial returns with respect to these hedging activities while

the value of your ETNs decline or become zero." Thus, Credit Suisse used "hedging" to refer to the receipt of profits, and not just the avoidance of losses. Indeed, on April 25, 2018, Credit Suisse reported that it had generated approximately CHF 490 million (or roughly $490 million) in revenues for its equity sales and trading division for the fiscal quarter ended March 31, 2018, a 30% increase compared to the previous quarter, stating that the positive results were "due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business."

41. By some estimates, in order to accomplish this "hedging" activity, Credit Suisse needed to buy up approximately 105,000 VIX futures contracts – roughly one quarter of the entire VIX futures market – driving up the price of VIX futures and intentionally destroying the value of Inverse ETNs. This "hedging" activity was in addition to any proprietary trading activities in volatility markets that Credit Suisse undertook at the expense of investors in the Inverse ETNs. These activities had their intended effect, causing a spike in the price of VIX Futures contracts at the end of the trading day and into the aftermarket on February 5, 2018, which corresponded to a destruction in value of the Inverse ETNs.

42. By the close of trading on February 5, 2018, the price of XIV had dropped to $99 per ETN, from the prior close of $115.55 per ETN, a 14% decline. However, investors suffered additional losses in the aftermarket, and by close of trading on February 6, 2018, the price of the XIV had fallen to $7.35, a one-day decline of over 92%. That same day, Credit Suisse announced that the sharp decline in the price of the XIV had triggered an "acceleration event" under the terms of the ETN, allowing Credit Suisse to force redemption of the notes for pennies on the dollar and essentially erasing more than $1.5 billion in liabilities. Investors would ultimately receive only $5.99 for each XIV ETN, even though millions of notes had been offered

to investors for prices as high as $134 little more than one week before the February 5 volatility event.

43.     Investors in the ZIV suffered millions of dollars in collateral damage from the run on VIX futures contracts and the forced redemption of the XIV.  Between February 2, 2018 and February 6, 2018, the price of ZIV dropped to $68.50 from $85.41 on abnormally high trading volume, a 20% decline in two trading days, causing plaintiff and the class to suffer losses and damages under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE – FRAUD-ON-THE-MARKET DOCTRINE AND *AFFILIATED UTE* ALLEGATIONS

44.     Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated in substantial part upon material omissions of fact that defendants had a duty to disclose.

45.     In the alternative, plaintiff is entitled to a presumption of reliance on defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for ZIV ETNs was an efficient market for the following reasons, among others:

    a.      ZIV ETNs actively traded on the NASDAQ, a highly efficient, electronic stock market;

    b.      As a regulated issuer, Credit Suisse filed periodic public reports with the SEC; and

    c.      Credit Suisse regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

**NO SAFE HARBOR**

46. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this complaint.

47. Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

48. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

49. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading, and the forward-looking statement was authorized and/or approved by an executive officer of Credit Suisse or Janus who knew that the forward-looking statement was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class consisting of all persons or entities who purchased or acquired the ZIV ETNs during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are defendants, their agents, officers and directors, and any entity in which defendants have or had a controlling interest.

51.     The members of the Class are so numerous that joinder of all members is impracticable.  According to the Registration Statement, there were 2.498 million ZIV ETNs issued and outstanding as of January 26, 2018.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by defendants and/or transfer agent(s) and/or broker dealers for the ZIV ETNs and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law, as complained of herein.

53.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the 1933 Act and/or 1934 Act and Rule 10b-5 promulgated thereunder;

(b)     whether the price of ZIV ETNs was artificially inflated and/or maintained during the Class Period;

(c)     whether defendants manipulated the price of ZIV ETNs during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of §11 of the 1933 Act
### Against All Defendants

56.     Plaintiff repeats and realleges the foregoing paragraphs by reference.

57.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, against all defendants.

58.     This Count does not sound in fraud and this Count expressly disavows any allegations of fraud.  For the purposes of his 1933 Act claims, plaintiff does not allege that the Credit Suisse Defendants or the Janus Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

59.     The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

60.     Credit Suisse is the registrant for the ZIV ETNs sold during the Class Period.  As the issuer of the shares, Credit Suisse is strictly liable to plaintiff for the misstatements and omissions.

61.     Each of the defendants were responsible for the contents and dissemination of the Registration Statement.  In addition, defendants Thiam and Mathers both signed the Registration Statement and defendants CSSU and JHD served as underwriters for the offer and sale of ZIV to investors.

62.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

63.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

64.     Plaintiff and the Class purchased ZIV ETNs pursuant to the Registration Statement.

65.     Plaintiff and the Class have sustained damages.  The value of ZIV ETNs has declined substantially subsequent to and due to defendants' violations.

66.     At the time of their purchases of ZIV ETNs, plaintiff and the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff filed this Complaint.  Less than

three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this Complaint.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against the Credit Suisse Defendants and Janus

67.     Plaintiff repeats and realleges the foregoing paragraphs by reference.

68.     This Count is brought pursuant to §15 of the 1933 Act against the Credit Suisse Defendants and Janus.

69.     The Individual Defendants were each control persons of Credit Suisse by virtue of their positions as directors and/or senior officers of Credit Suisse and CSI.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Credit Suisse.  The Individual Defendants signed the Registration Statement and were responsible for its contents.

70.     Credit Suisse controlled defendants CSI and CSSU, its wholly-owned subsidiaries, which made up a substantial portion of Credit Suisse's overall operations.  Credit Suisse also controlled the Individual Defendants and all of its employees.

71.     Janus controlled defendants JIC and JHD, its wholly-owned subsidiaries.

72.     The defendants named herein each were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement, constructing and managing the ZIV, creating and disseminating the Registration Statement, marketing and selling ZIV ETNs and/or having otherwise participated in the process that allowed the offer and sale of ZIV to investors be successfully completed.

**COUNT III**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

73.     Plaintiff incorporates the foregoing paragraphs by reference.

74.     Defendants each disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff in connection with his purchases of ZIV ETNs.

76.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ZIV ETNs.  They would not have purchased ZIV ETNs at the price paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

77.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their purchases of ZIV ETNs.

**COUNT IV**
**Violation of §10(b) of the 1934 Act**
**and Rules 10b-5(a) and 10b-5(c) Promulgated Thereunder**
**Against the Credit Suisse Defendants**

78.     Plaintiff incorporates the foregoing paragraphs by reference.

79.     During the Class Period, the Credit Suisse Defendants engaged in conduct intended to mislead investors by artificially affecting the price of ZIV ETNs.  Credit Suisse, CSI, CSSU and the Individual Defendants employed devices, schemes, and artifices to defraud, and/or engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff as a purchaser of ZIV ETNs.

80.     Plaintiff and the Class have suffered damages from the Credit Suisse Defendants' manipulative acts in that, in reliance on an assumption of an efficient market free of manipulation, they purchased ZIV ETNs.  Plaintiff and the Class would not have purchased ZIV notes at the prices paid, or at all, if they had been aware of the Credit Suisse Defendants' manipulative conduct which artificially affected the prices of ZIV notes.

81.     As a direct and proximate result of the Credit Suisse Defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their purchases of ZIV notes.

## COUNT V

### For Violation of §20(a) of the 1934 Act
### Against Credit Suisse, the Individual Defendants and Janus

82.     Plaintiff incorporates the foregoing paragraphs by reference.

83.     Each of the defendants named herein were control persons within the meaning of §20(a) of the 1934 Act.

84.     The Individual Defendants were each control persons of Credit Suisse by virtue of their positions as directors and/or senior officers of Credit Suisse and CSI.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Credit Suisse.  The Individual

Defendants signed the Registration Statement and were responsible for its contents and held themselves out to investors as among those most knowledgeable about the ZIV.

85.     Credit Suisse controlled defendants CSI and CSSU, its wholly-owned subsidiaries, which made up a substantial portion of Credit Suisse's overall operations.  Credit Suisse also controlled the Individual Defendants and all of its employees.

86.     Janus controlled defendants JIC and JHD, its wholly-owned subsidiaries.

87.     The defendants named herein each were culpable participants in the violations of §10(b) of the 1934 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement, constructing and managing the ZIV, creating and disseminating the Registration Statement, marketing and selling ZIV ETNs and/or having otherwise participated in the process that allowed the offer and sale of ZIV to investors be successfully completed.

**COUNT VI**
**Violation of §9(a)(4) of the 1934 Act**
**Against the Credit Suisse Defendants, Janus and JIC**

88.     Plaintiff incorporates the foregoing paragraphs by reference.

89.     During the Class Period, the Credit Suisse Defendants, Janus, and JIC made, had authority over or controlled the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     The Credit Suisse Defendants, Janus, and JIC made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading.

91.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ZIV ETNs.  Plaintiff and the Class would

not have purchased ZIV notes at the prices paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Credit Suisse Defendants', Janus's, and JIC's misleading statements.

92.     As a direct and proximate result of the Credit Suisse Defendants', Janus's, and JIC's wrongful conduct, plaintiff and the Class suffered damages in connection with their purchases of ZIV notes during the Class Period.

### COUNT VII
### Violation of §9(f) of the 1934 Act
### Against All Defendants

93.     Plaintiff incorporates the foregoing paragraphs by reference.

94.     During the Class Period, each defendant willfully participated in the Credit Suisse Defendants', Janus's, and JIC's violation of §9(a) of the 1934 Act.  All defendants willfully participated in the Credit Suisse Defendants', Janus's, and JIC's making of, or control over, untrue statements of material fact and/or omissions to state material facts necessary to make the statements not misleading

95.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ZIV ETNs.  Plaintiff and the Class would not have purchased ZIV notes at the prices paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Credit Suisse Defendants', Janus's, and JIC's misleading statements.

96.     As a direct and proximate result of defendants' willful participation in the foregoing wrongful conduct, plaintiff and the Class suffered damages in connection with their purchases of ZIV notes.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Federal Rule of Civil Procedure 23 and plaintiff's counsel as Lead Counsel;

B.      Awarding damages, to the maximum extent permitted by law, in favor of plaintiff and the other Class members against all defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such equitable, injunctive or other relief as deemed appropriate by the Court.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

DATED: February 4, 2019                    Respectfully submitted,

By:  */s/ Jeffrey S. Abraham*
Jeffrey S. Abraham
Matthew E. Guarnero
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, New York 10119
Tel. (212) 279-5050
Fax. (212) 279-3655
Email: JAbraham@aftlaw.com
          MGuarnero@aftlaw.com

**Attorneys for Plaintiff**