**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIAN RUBINSTEIN, BARBARA ANTINORO AND DAVID FLEER Individually and on Behalf of All Others Similarly Situated, <br><br>     PLAINTIFFS, <br><br>   v. <br><br>CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE SECURITIES (USA) LLC, TIDJANE THIAM, AND DAVID R. MATHERS, <br><br>     DEFENDANTS. | 1:19-cv-01069-VEC <br><br> <u>**Oral Argument Requested**</u> |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO**
<u>**DISMISS THE AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**</u>

CAHILL GORDON & REINDEL LLP
 Herbert S. Washer
 David G. Januszewski
 Peter J. Linken
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 259-5420

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse Securities (USA) LLC, Tidjane Thiam, and David R. Mathers*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND ...........................................................................................4

      A.    The Risk Disclosures .................................................................4
      B.    Plaintiffs' Claims ......................................................................7

LEGAL STANDARDS ...................................................................................................7

ARGUMENT ..................................................................................................................8

I.     THE REGISTRATION STATEMENT IS DEVOID OF
MATERIAL MISSTATEMENTS OR OMISSIONS.............................................8

      A.    The Pricing Supplement Accurately and Adequately
Disclosed the Risks ...................................................................9

      B.    Plaintiffs Fail to Adequately Allege a Claim Pursuant to
Regulation S-K..........................................................................14

II.    PLAINTIFFS' CLAIMED LOSS IS NOT CAUSALLY
CONNECTED TO THE ALLEGED MISREPRESENTATIONS.......................18

III.   PLAINTIFFS' CONTROL PERSON CLAIM FAILS AS A
MATTER OF LAW ............................................................................20

CONCLUSION................................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)............................................................................................7, 21, 23

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544, 570 (2007).............................................................................................7

*City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014)...................................................................................15, 16

*Cosmas* v. *Merrill Lynch & Co.*,
1993 WL 800778 (S.D.N.Y. July 2, 1993) ...............................................................13

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ......................................................16, 18

*Dura Pharm., Inc.* v. *Broudo*,
544 U.S. 336 (2005).....................................................................................................20

*Elite Aviation LLC* v. *Credit Suisse AG*,
588 F. App'x 37 (2d Cir. 2014) ............................................................................2, 8, 9

*Ellison* v. *Am. Image Motor Co., Inc.*,
36 F. Supp. 2d 628 (S.D.N.Y. 1999)..........................................................................22

*First Nationwide Bank* v. *Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)...........................................................................................20

*Garber* v. *Legg Mason, Inc.*,
347 F. App'x 665 (2d Cir. 2009) ................................................................................13

*Garber* v. *Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008)..................................................................... 17-18

*Halbert* v. *Credit Suisse AG*,
2019 WL 3975362 (N.D. Al. Aug. 22, 2019) ................................................. *passim*

*Hirsch* v. *Arthur Andersen & Co.*,
72 F.3d 1085 (2d Cir. 1995)..........................................................................................7

*In re IAC/Interactive Corp. Sec. Litig.*,
695 F. Supp. 2d 109 (S.D.N.Y. 2010)........................................................................18n

*Kramer* v. *Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991)..................................................................4n

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
650 F.3d 167 (2d Cir. 2011).....................................................................21

*Leneau* v. *Ponte*,
2018 WL 566456 (S.D.N.Y. Jan. 25, 2018) ......................................15n

*Lentell* v. *Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005)................................................... 18-19, 20

*In re Lions Gate Entm't Corp. Sec. Litig.*,
2016 WL 297722 (S.D.N.Y. Jan. 22, 2016) ......................................15

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003)........................................2, 13, 14

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)..........................................................2, 8

*Nicosia* v. *Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016).....................................................................4n

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ......................................18

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*,
98 F.3d 2 (2d Cir. 1996)........................................................................8, 9

*Ong* v. *Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018)........................................... 15-16

*In re Optionable Sec. Litig.*,
577 F. Supp. 2d 681 (S.D.N.Y. 2008)....................................................7

*Pani* v. *Empire Blue Cross Blue Shield*,
152 F.3d 67 (2d Cir. 1998)........................................................................19

*Panther Partners Inc.* v. *Ikanos Communications, Inc.*,
681 F.3d 114 (2d Cir. 2012)........................................................................18

*In re Petrobras Sec. Litig.*,
152 F. Supp. 3d 186 (S.D.N.Y. 2016)........................................21, 22

*Phillips* v. *Kidder, Peabody & Co.*,
933 F.Supp 303 (S.D.N.Y. 1996) ......................................................13

*Plumbers & Steamfitters Local 137 Pension Fund* v. *Am. Express Co.*,
    2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017)............................................................13, 16

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
    2015 WL 5707652 (S.D.N.Y. Sept. 29, 2015).....................................................................18

*In re ProShares Trust Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013)..................................................................................................8

*Ret. Sys. of Miss.* v. *Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)...............................................................................21

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................................................21

*Set Capital LLC* v. *Credit Suisse Grp. AG* (*Set Capital R&R*),
    2019 WL 3940641 (S.D.N.Y. Aug. 16, 2019)............................................................ *passim*

*Set Capital LLC* v. *Credit Suisse Grp. AG* (*Set Capital Order*),
    2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019).......................................................1, 8, 10, 16

*Silverstrand Invs.* v. *AMAG Pharm., Inc.*,
    707 F.3d 95 (1st Cir. 2013)...............................................................................................15

*Sloane Overseas Fund, Ltd.* v. *Sapiens Intern. Corp., N.V.*,
    941 F. Supp. 1369 (S.D.N.Y. 1996)..................................................................................22

*Stadnick* v. *Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017).........................................................................................13, 14

*In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011)...............................................................................19

*In re TVIX Sec. Litig.*,
    25 F. Supp. 3d 444 (S.D.N.Y. 2014)..................................................................2, 9, 9n, 13

*Wilson* v. *Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011)..............................................................................................12

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)..............................................................................15n

## Regulations

17 C.F.R. § 229.105.............................................................................................................14

17 C.F.R. § 229.303(a)(3)(ii).................................................................................................14

**Regulatory Release**

Management's Discussion and Analysis of Financial Condition and Results of
    Operations, Securities Act Release No. 6835, Exchange Act Release No.
    26,831, Investment Company Act Release No. 16,961, 43 SEC 1330 (May 18,
    1989) ................................................................................................................................18

Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse Securities (USA) LLC, Tidjane Thiam, and David R. Mathers (together with Thiam, the "Individual Defendants") (collectively, the "Defendants") respectfully submit this Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint (the "Complaint") for Failure to State a Claim.

## PRELIMINARY STATEMENT

Plaintiffs assert claims pursuant to Sections 11 and 15 of the Securities Act of 1933 premised entirely upon the alleged deficiencies of the Offering Documents (defined herein) for the VelocityShares Daily Inverse VIX Medium-Term Exchange Traded Notes (the "ZIV ETNs"). Two United States District Judges already have dismissed nearly identical claims premised upon the very same Registration Statement,[1] and nothing in Plaintiffs' Complaint warrants a different conclusion.

For example, in *Set Capital LLC* v. *Credit Suisse Grp. AG* ("*Set Capital Order*"), 2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019), *appeal pending*, Judge Torres adopted in full Magistrate Judge Netburn's Report and Recommendation that found the Registration Statement to be devoid of material misstatements or omissions and dismissed with prejudice each of the class plaintiffs' claims. *See also Set Capital LLC* v. *Credit Suisse Grp. AG* ("*Set Capital R&R*"), 2019 WL 3940641, at *11 (S.D.N.Y. Aug. 16, 2019) ("There are no actionable misstatements or omissions in the Offering Documents. The Section 11 claims should, therefore, be dismissed in their entirety."). Similarly, on August 22, 2019, Judge Kallon of the Northern District of Alabama ruled that the same Registration Statement was "transparent about the nature of Credit Suisse's hedging activities, the potential adverse consequences for investors, and the significant risks of

---

[1]    Capitalized terms used herein and not otherwise defined have the meaning ascribed to them in Plaintiffs' Complaint.

acceleration and loss. . . . Accordingly, the disclosures rendered the statements at issue not misleading as a matter of law." *Halbert* v. *Credit Suisse AG*, 2019 WL 3975362, at *9 (N.D. Ala. Aug. 22, 2019); *see also In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC* v. *Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014).

Plaintiffs' Section 11 claim is subject to dismissal based upon a straightforward application of well-established Second Circuit precedent. As set forth at Section I.A., *infra*, courts considering Section 11 claims analyze the relevant disclosures through the lens of materiality. The probative question is "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).[2] Here, the Registration Statement incorporated robust disclosures addressing each of the risks that Plaintiffs claim caused their losses. *See infra* Section I.A. These disclosures have withstood numerous legal challenges and "clearly disclosed in numerous, repeated, sometimes boldfaced warnings" the very risks that materialized. *Elite Aviation LLC*, 588 F. App'x at 38. Nothing more is required, and the Section 11 claim should be dismissed.

Even more glaring, however, is Plaintiffs' admission on the face of their Complaint that the market was aware of the allegedly omitted risks a full six years before the ZIV ETNs suffered the complained-of losses. *See* Compl. ¶ 25 (alleging that ***no later than 2012*** the market knew that VIX pricing was subject to manipulation); *id.* ¶¶ 26-27 (alleging that by 2017 numerous sources disclosed to the market the exact manner in which parties could manipulate the market for VIX Futures). "Section[] 11 . . . do[es] not require the disclosure of publicly available information" (*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F.

---

[2]       Unless otherwise specified, internal quotation marks and citations are omitted.

Supp. 2d 243, 249-50 (S.D.N.Y. 2003)), and the publicly available facts render untenable Plaintiffs' allegation that the Registration Statement did not disclose that "the underlying market in VIX Futures was subject to being manipulated in a manner disadvantageous to ZIV investors." Compl. ¶ 1.

Nor should the Court credit Plaintiffs' summary attempt to stave off dismissal by invoking Regulation S-K. Second Circuit precedent makes plain that a party pleading an alleged violation of Regulation S-K must satisfy the additional burden of pleading the defendants' actual knowledge of the violation. This requirement sets Regulation S-K claims apart from the strict liability framework of Section 11 claims, and Plaintiffs allege nothing close to establishing that any Defendant possessed any knowledge regarding the alleged omissions. In fact, the entirety of Plaintiffs' Regulation S-K allegations appears in three conclusory paragraphs that are inserted into the complaint as an afterthought. *See id*. ¶¶ 63-65. Plaintiffs point to no facts, no reports, no statements—no evidence whatsoever—to establish that the Defendants (or which particular Defendants) possessed the knowledge required to state a Regulation S-K claim.

Plaintiffs' claims also fail for want of a plausible theory of loss causation. The Complaint makes clear that Plaintiffs and other ZIV ETN investors made "bets that historic low volatility . . . would continue unabated" (*id*. ¶ 36) and those "bets" unraveled on February 5, 2018 when "a liquidity gap in VIX futures suddenly materialized . . . amid concerns about rising bond yields and higher inflation." *Id*. ¶ 47. This sudden change in volatility, coupled with the relatively low level of the VIX beforehand, wiped out substantial value that had been generated during the preceding period of relative calm. These events were not due to any conduct attributable to Defendants and reflected concerns related to the broader economic market.

Plaintiffs do not identify any corrective disclosure or other revelation of Defendants' alleged

wrongdoing causing their losses, and the Complaint should be dismissed for that reason as well.

## FACTUAL BACKGROUND

### A.      The Risk Disclosures

The ZIV ETNs were issued pursuant to a Registration Statement, prospectus, prospectus

supplement, and January 29, 2018 pricing supplement ("Pricing Supplement") (collectively, the

"Offering Documents"), each of which was filed with the SEC.  *See* Compl. ¶ 56.[3]  The Pricing

Supplement contained fulsome, often bold-face typed, disclosures concerning, *inter alia*, the

risks of investing in and holding the ETNs; Credit Suisse's intent to hedge its exposure to the

ETNs; and other pricing risks.  These robust disclosures informed Plaintiffs and other ZIV ETN

investors of the very risks of which Plaintiffs now complain.  A true and correct copy of the

Pricing Supplement is appended as Exhibit A to the Declaration of Peter J. Linken (the "Linken

Decl.") submitted herewith.

1.   The ZIV ETNs Were Trading Tools Intended for Sophisticated Investors

The Pricing Supplement repeatedly emphasized that the ETNs, including the ZIV ETNs,

were intended to be a risk management tool for sophisticated investors to use on a short-term

basis.  Investors who chose to hold the ETNs for longer periods faced significant risks, including

the risk of losing their entire investment.  The Pricing Supplement disclosed this fundamental

risk in a number of places.  For example, it stated in boldface type on its cover:

**The ETNs . . . are intended to be trading tools for sophisticated investors to manage daily trading risks.  They are designed to**

---

[3]      The Court may consider the Pricing Supplement, the other Offering Documents, and required SEC filings in deciding the instant motion.  *See Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint."); *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (courts may consider "public disclosure documents required by law to be filed, and actually filed, with the SEC").

> **achieve their stated investment objectives on a daily basis . . . .
> The ETNs are riskier than securities that have intermediate or
> long-term investment objectives and may not be suitable for
> investors who plan to hold them longer than one day.
> Accordingly, the ETNs should be purchased only by
> knowledgeable investors who understand the potential
> consequences of investing in volatility indices and seeking
> inverse or leveraged investment results, as applicable.**

Linken Decl. Ex. A at PS-Cover at 1.  These warnings were repeated on the first page of the

Pricing Supplement, and again at page PS-10.  Additionally, under the heading "Is this the right

investment for you?" the Pricing Supplement again cautioned that the ETNs were not appropriate

for investors seeking "a guaranteed return" on their initial investment or who were "not willing

to be exposed to fluctuations in volatility in general and in the level of the applicable underlying

Index in particular."  *Id*. at PS-11; *see id.* at PS-12 (noting that inverse ETNs are not suitable for

investors who believe that the value of the underlying index will *increase* because the return on

the ETNs varies based on the movements in the underlying index).

2.  <u>Volatile Markets ***Would*** Affect the Return on the ZIV ETNs</u>

In a lengthy section entitled "Risk Factors," the Pricing Supplement described the effect

that market volatility could have on the ETNs' returns, including the ZIV ETNs' returns, and

noted that "***[b]ecause of the large and sudden price movement associated with futures on the***

***VIX Index, and the daily objective of the ETNs (including inverse . . . exposure), the ETNs are***

***intended specifically for short term trading***."  *Id.* at PS-14.  To further this point, the Pricing

Supplement contained numerous underscored warnings, including that "**<u>[t]he long term</u>**

**<u>expected value of your ETNs is zero.  If you hold your ETNs as a long term investment, it is</u>**

**<u>likely that you will lose all or a substantial portion of your investment</u>**."  *Id.* at PS-16.  In

sum, the Pricing Supplement was clear that investors "**<u>should proceed with extreme caution in</u>**

**<u>considering an investment in the ETNs</u>**."  *Id.* at PS-14.

3.  Credit Suisse's Intent to Hedge Its Exposure

The Pricing Supplement also contained comprehensive disclosures concerning Credit

Suisse's intention to hedge its own exposure to the ETNs, including the ZIV ETNs, and thereby

manage the risks associated with paying off the ETNs at maturity or upon redemption:

> We expect to hedge our obligations under the ETNs through one or
> more of our affiliates. . . . The costs of maintaining or adjusting
> **this hedging activity could affect the value of the Index, and**
> **accordingly the value of the ETNs**.   Moreover, **this hedging**
> **activity may result in our or our affiliates' receipt of a profit,**
> **even if the market value of the ETNs declines**. . . . There may be
> conflicts of interest between you, us, the Redemption Agent, and
> the Calculation Agents . . . .

*Id*. at PS-13 (emphasis added); *see also id.* at PS-17 ("[H]edging transactions **will contribute** to

the trading volume of the underlying futures contracts and may adversely affect the market price

of such underlying futures contracts and in turn the level of the applicable underlying Index.")

(emphasis added); *id.* at PS-50 ("The hedging activity discussed above may adversely affect the

level of the applicable underlying Index and, as a consequence, the market value of the ETNs

and the amount payable at maturity, upon redemption or upon acceleration.").  The Pricing

Supplement explained that Credit Suisse's hedging could affect the value of the ETNs and that

Credit Suisse or its affiliates "could receive substantial returns with respect to these hedging

activities while the value of your ETNs decline[s] or become[s] zero."  *Id.* at PS-24.

The Pricing Supplement also addressed head-on the allegations that other market

participants could engage in trading behavior that would affect the ZIV ETNs' value.  For

example, page PS-26 of the Pricing Supplement disclosed that futures markets—like those for

the VIX futures—were subject to "temporary distortions or other disruptions due to various

factors, including" the trading activity of "speculators."  The Pricing Supplement continued:

"[t]he market value of the ETNs will be affected by several factors, many of which are beyond

our control." *Id.* at PS-39.  Among the "factors that may influence the market value of the ETNs" were "supply and demand for the ETNs including inventory positions with any market maker, the volatility of the applicable underlying Index, . . . [and] supply and demand as well as hedging activities in the equity-linked structured product markets." *Id.*

### B.     Plaintiffs' Claims

On February 5, 2018, markets turned volatile and the Intraday Indicative Value of the ZIV ETNs declined, ultimately falling 14.5% from the prior day's Closing Indicative Value. Compl. ¶ 48.  Plaintiffs assert claims for violations of Sections 11 and 15 of the Securities Act of 1933 based principally on the theory that the Offering Documents were materially false or misleading because they failed to adequately disclose the risks of investing in the ETNs. Plaintiffs' theory finds no support in the pleaded facts or applicable law, and the Complaint should be dismissed.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  While the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, this requirement does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*  Nor must the Court credit claims that are contradicted by documents incorporated in the complaint or publicly filed with the SEC.  *See Hirsch* v. *Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) ("If . . . allegations of securities fraud conflict

with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true.") (alteration in original).

## **ARGUMENT**

### I.   THE REGISTRATION STATEMENT IS DEVOID OF MATERIAL MISSTATEMENTS OR OMISSIONS

Claims brought pursuant to Section 11 of the Securities Act require a material misstatement or omission of fact in a registration statement. *See In re Morgan Stanley Info.*, 592 F.3d at 358-59. The key question regarding materiality is "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Id.* at 360. A Section 11 claim fails as a matter of law "[w]hen a registration statement warns of the exact risk that later materialized . . . ." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013); *see also Elite Aviation LLC*, 588 F. App'x at 38 (affirming dismissal of claims concerning related volatility-linked ETNs because "the Pricing Supplement clearly disclosed in numerous, repeated, sometimes boldfaced warnings" the very risk that materialized); *Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (affirming dismissal where "[t]he prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed").

Plaintiffs cannot escape the reach and relevance of the disclosures, which warned of the very risks about which Plaintiffs now complain. In *Set Capital*, Judge Torres adopted Magistrate Judge Netburn's Report and Recommendation finding that the ***very same Offering Documents at issue here*** were devoid of actionable misstatements or omissions. *Set Capital R&R*, 2019 WL 3940641, at *12; *see also Set Capital Order*, 2019 WL 4673433, at *4-*5. Similarly, Judge Kallon dismissed a Section 11 claim premised upon the same Offering Documents because there were no actionable misstatements or omissions regarding the risks that allegedly materialized. *Halbert*, 2019 WL 3975362, at *6. Plaintiffs' Section 11 claim should similarly be dismissed.

- 8 -

A.       **The Pricing Supplement Accurately and Adequately Disclosed the Risks**

Plaintiffs' Section 11 claim is implausible as it ignores the numerous robust, bold-type, and directly relevant disclosures repeated throughout the Pricing Supplement and described in detail *supra*.  *See Elite Aviation LLC*, 588 F. App'x at 38.  Although Plaintiffs acknowledge these disclosures throughout the Complaint (*see, e.g.*, Compl. ¶¶ 57, 58, 60, 61), Plaintiffs claim that they were misled about the risks of investing in the ZIV ETNs.  Plaintiffs' theory cannot be reconciled with the Pricing Supplement's disclosures.

Indeed, an earlier case against Credit Suisse arising out of securities similar to the ZIV ETNs is dispositive.  *See In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444.  The instruments at issue in *TVIX* were sold pursuant to offering materials that covered a suite of Credit Suisse-issued volatility-linked products, including TVIX, ZIV, and XIV.  The *TVIX* plaintiffs alleged that the disclaimers did not adequately disclose all relevant risks, including material information about potential liquidity shortages in the market.[4]  Judge Swain rejected these claims because they were "rendered untenable by the more than 25 plain English warnings concerning the risks of prolonged investments that are provided throughout the Pricing Supplement."  *Id.* at 450; *see also Olkey*, 98 F.3d at 5 (affirming dismissal of Section 11 claims where "[t]he prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed").

More recently, Magistrate Judge Netburn, District Judge Torres, and Alabama District Judge Kallon have echoed Judge Swain's analysis (as affirmed by the Second Circuit) to find that the Offering Documents at issue here were devoid of material misstatements or omissions. Judges Netburn and Torres found unequivocally that "[t]here are no actionable misstatements or

---

[4]       Judge Swain also rejected that a statement concerning how "'[d]aily rebalancing will impair the performance of each ETN if the underlying Index experiences volatility' was insufficient to cover the virtual certainty and magnitude of the daily decay of the notes."  *In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 451.

omissions in the Offering Documents." *Set Capital R&R*, 2019 WL 3940641, at *11; *Set Capital Order*, 2019 WL 4673433, at *4.  Judge Kallon likewise concluded that "the Offering Documents here were transparent about the nature of Credit Suisse's hedging activities, the potential adverse consequences for investors, and the significant risks of acceleration and loss. 'Defendants are not required to "predict the precise manner in which risks will manifest themselves."'" *Halbert*, 2019 WL 3975362, at *9.

Plaintiffs nevertheless persist in challenging the adequacy of the Offering Documents in two regards.  First, Plaintiffs allege that the Offering Documents did not adequately disclose risks attributable to Credit Suisse's own conduct.  *See* Compl. ¶ 62.  Second, Plaintiffs allege that the Offering Documents did not disclose risks presented by the conduct of other non-party market participants.  *See id*. ¶ 59.  Neither theory is sustainable.

1.   *The Offering Documents Disclosed All of Credit Suisse's Conduct*

Plaintiffs' first flawed theory centers on Credit Suisse's disclosed hedging activity. Specifically, Plaintiffs allege that Credit Suisse misrepresented the extent of its hedging, the amount of volatility-related exchange-traded products ("ETPs") sold by issuers, including Credit Suisse, and the effect such hedging activity would have on the value of, and market for, the ETNs.  These claims border on the frivolous—the Pricing Supplement disclosed every element of Plaintiffs' claim that Credit Suisse was required to address: that Credit Suisse would actively hedge its exposure to the ETNs and that hedging was likely to affect the value of the underlying indices (and, therefore, the ETNs).  *See, e.g.*, Linken Decl. Ex. A at PS-16 – PS-17, PS-24 – PS-25; *Set Capital R&R*, 2019 WL 3940641, at *5-*6, *12; *Halbert*, 2019 WL 3975362, at *9 ("[T]he Offering Documents here were transparent about the nature of Credit Suisse's hedging

activities, the potential adverse consequences for investors, and the significant risks of . . .

loss.").

Indeed, the Complaint acknowledges one such warning, which cautioned investors that:

The daily rebalancing of the leverage amount of each ETN back to its target may cause us, our affiliates, or third parties with whom we transact to adjust their hedges accordingly.   The trading activity associated with these hedging transactions will contribute to the trading volume of the underlying futures and may adversely affect the market price of such underlying futures.

*See* Compl. ¶ 60; Linken Decl. Ex. A at PS-28; *see also* Linken Decl. Ex. A at PS-16 – PS-17

("The trading activity associated with these hedging transactions . . . may adversely affect the

market price of such underlying futures contracts and in turn the level of the applicable

underlying Index.").   The Pricing Supplement "specifically warned that hedging necessary for

rebalancing at the end of each trading day ***would*** 'contribute to the trading volume of the

underlying futures contracts'" and could adversely influence the underlying futures contracts and

Index, the "exact risk that materialized on February 5, 2018."  *Set Capital R&R*, 2019 WL

3940641, at *12 (emphasis added).   The Pricing Supplement "more than adequately warned

investors of the possible deleterious effect of Credit Suisse's hedging."  *Id.*

Despite Plaintiffs' arguments to the contrary (*see* Compl. ¶ 62), the Pricing Supplement

also fully disclosed the risk that various other factors could influence the value of the ETNs.  For

example, the Pricing Supplement notified investors of the potential impact that liquidity issues in

the underlying futures could have on the value of the ETNs.  *See* Linken Decl. Ex. A at PS-21

(stating that "the liquidity of any option or futures contracts relating to the applicable underlying

Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or

the underlying futures" would influence the value of the ETNs).  Moreover, the Pricing

Supplement disclosed that "temporary distortions or other disruptions" in the VIX futures

market, "including the lack of liquidity in the markets, the participation of speculators, and government regulation and intervention," could impact the value of the ETNs. *Id.* at PS-26. There cannot be a material misstatement or omission if "[defendants'] . . . statement[s] explicitly disclosed the very liquidity risks about which [plaintiffs] claim to have been misled." *Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 135 (2d Cir. 2011).

Plaintiffs also claim that the Registration Statement did not adequately disclose that "ZIV was not appropriate even for investors . . . 'managing their portfolios on a daily basis.'" Compl. ¶ 62. But the Pricing Supplement did warn investors that, regardless of the length of time the ETNs were held, the "notes were not appropriate for investors seeking 'a guaranteed return' on their initial investment or investors 'not willing to be exposed to fluctuations in volatility in general and in the level of the applicable underlying Index in particular'" (*Set Capital R&R*, 2019 WL 3940641, at *5 (quoting Linken Decl. Ex. A at PS-15)); the "notes were *not* a suitable investment for those who believed that 'the level of the applicable underlying Index will . . . increase'" (*id.* (quoting Linken Decl. Ex. A at PS-12, PS-15)); and "[investors] '**should proceed with extreme caution in considering an investment in the ETNs**'" (*id.* (quoting Linken Decl. Ex. A at PS-14)). Furthermore, the Pricing Supplement stated that "[t]he ETNs are only suitable for a very short investment horizon. The relationship between the level of the VIX Index and the underlying futures on the VIX Index will begin to break down as the length of an investor's holding period increases, *even within the course of a single Index Business Day*." Linken Decl. Ex. A at PS-15 (emphasis added).

### 2. *Credit Suisse Was Not Required to Disclose the Potential Conduct of Others or Publicly Known Information*

Equally unpersuasive is Plaintiffs' allegation that Credit Suisse "failed to disclose that . . . SPVIXMTR, upon which ZIV was based, was subject to manipulation by sophisticated market

participants." Compl. ¶ 59. As an initial matter, the federal securities laws do not impose an obligation to disclose the potential conduct or activity of other market participants. *See Cosmas* v. *Merrill Lynch & Co.*, 1993 WL 800778, at *1 (S.D.N.Y. July 2, 1993) (finding that "[a] prospectus must disclose only material '*firm specific* information. . . .'" and there is "no duty to predict what stock traders would or would not do in the future"); *see also In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 457 ("Defendants are not required to "'predict the precise manner in which risks will manifest themselves.'"); *Phillips* v. *Kidder, Peabody & Co.*, 933 F. Supp. 303, 322 (S.D.N.Y. 1996) ("Securities laws require issuers to disclose *firm-specific* information; investors and analysts combine that information with knowledge about the competition, regulatory conditions, and the economy as a whole to produce a value for stock."), *aff'd sub nom. Phillips* v. *Kidder Peabody & Co.*, 108 F.3d 1370 (2d Cir. 1997). Regardless, Plaintiffs themselves acknowledge that the potential for manipulation in VIX pricing was publicly known as far back as 2012. *See* Compl. ¶¶ 25-27. Omitting such information—even assuming it would otherwise be material—is not actionable. *See Stadnick* v. *Vivint Solar, Inc.*, 861 F.3d 31, 38 (2d Cir. 2017) ("The materiality of an omission must be assessed in light of the total mix of information in the public domain."); *Garber* v. *Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (finding that the omission of information that was reported in news articles and SEC filings was not material because it was "already in the public domain and . . . reasonably available" to plaintiffs); *Set Capital R&R*, 2019 WL 3940641, at *12; *In re Merrill Lynch*, 272 F. Supp. 2d at 250 ("Section[] 11 . . . do[es] not require the disclosure of publicly available information.").

The Second Circuit's decision in *Stadnick* is instructive. The Court analyzed the historical pattern of fluctuations in income and earnings-per-share over the course of a multi-year period to ascertain the materiality of alleged omissions concerning income and earnings-per-

share ("EPS") for one-quarter.  *See Stadnick*, 861 F.3d at 37.  Observing that the income and

EPS had fluctuated over time, the Second Circuit found that "[a] reasonable investor … would

not have harbored any solid expectations based on prior performance."  *Id.* at 39.  The same is

true here, where Plaintiffs acknowledge that "[d]uring at least three occasions over the last ten

years, market volatility spiked significantly and VIX Futures prices spiked at the end of the

trading day in a manner disproportionate to what would normally be expected."  Compl. ¶ 32;

*see Set Capital R&R*, 2019 WL 3940641, at *12.  Plaintiffs further admit it was public

knowledge that since a volatility spike last caused the value of the ZIV ETNs to decrease, "the

amount of money placed in ZIV and other similar ETPs and hedging strategies relating to the

SPVIXMTR increased dramatically," such that "the necessary rebalancing would inevitably

cause greater future price distortions."  Compl. ¶ 34; *see Set Capital R&R*, 2019 WL 3940641, at

*4, *12 ("The fact that the VIX-related ETN market had grown large enough to impact the price

of the underlying VIX futures was [] public knowledge.").  "The fact that the Offering

Documents did not relay this history was, therefore, not a material omission."  *Id.* at *12 (citing

*In re Merrill Lynch*, 272 F. Supp. 2d at 250).[5]

## B.   Plaintiffs Fail to Adequately Allege a Claim Pursuant to Regulation S-K

As an afterthought, Plaintiffs allege in three summary paragraphs that Credit Suisse

violated Items 105 and 303 of Regulation S-K by failing to disclose the impact on ZIV of the

---

[5]      Although Plaintiffs allege that Defendants failed to disclose that "historically, ETPs had failed to replicate the performance of the underlying VIX index in times of sharply increased volatility, which had become increasingly likely" (Compl. ¶ 59), the Pricing Supplement explicitly disclosed that "[t]he ETNs are not linked to the VIX Index."  Linken Decl. Ex. A at PS-16 ("The [applicable underlying Index] will not necessarily track the performance of the VIX Index."); *see also id.* at PS-37 ("There is no assurance that investment products based on the Indices will accurately track index performance or provide positive investment returns."); *id.* at PS-14 ("The ETNs do not accurately provide exposure to the level of the VIX Index . . . . Instead the ETNs track an index of futures on the VIX Index.  The impact of rolling futures contracts, compounding of returns . . . and volatility will very likely erode any potential returns of the VIX Index.").  Regardless, the public availability of information related to prior volatility spikes undermines Plaintiffs' argument.  *See Set Capital R&R*, 2019 WL 3940641, at *12.

ETNs' rebalancing requirements.  *See* Compl. ¶¶ 63-65; 17 C.F.R. § 229.105; 17 C.F.R.

§ 229.303(a)(3)(ii).  Unlike Plaintiffs' Section 11 claim, however, both Items 105 and 303

impose a knowledge requirement.  Nowhere in the Complaint do Plaintiffs identify specific facts

known by the Defendants (or by which particular Defendant, as is required to plead a claim)[6] that

should have been, but were not, disclosed in the Offering Documents.  In any event, and as

discussed above, the robust disclosures in the Offering Documents doom any attempt to plead a

violation of Items 105 and 303.

Item 105, formerly titled Item 503, "only applies to the 'most significant' risk factors."

*In re Lions Gate Entm't Corp. Sec. Litig.*, 2016 WL 297722, at *15 (S.D.N.Y. Jan. 22, 2016).

Disclosure under Item 105 "is not a rite of confession."  *City of Pontiac Policemen's &*

*Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).  To withstand dismissal, an

Item 105 claimant "needs to allege sufficient facts to infer that a registrant *knew*, as of the time

of an offering, that (1) a risk factor existed; (2) the risk factor could adversely affect the

registrant's present or future business expectations; and (3) the offering documents failed to

disclose the risk factor."  *Silverstrand Invs.* v. *AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir.

2013) (emphasis added).

Similarly, Item 303 requires disclosure only if "a trend, demand, commitment, event or

uncertainty is both presently known to management and reasonably likely to have material

effects on the registrant's financial conditions or results of operations."  *Ong* v. *Chipotle*

---

[6]     Plaintiffs rely on improper group pleading throughout the Complaint.  This is particularly glaring
with regard to the Regulation S-K allegations since Plaintiffs are required to identify what knowledge was
possessed by each defendant.  *See Leneau* v. *Ponte*, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018)
("[C]omplaints that rely on 'group pleading' and 'fail to differentiate as to which defendant was involved
in the alleged unlawful conduct are insufficient to state a claim.'"); *In re Zinc Antitrust Litig.*, 155 F.
Supp. 3d 337, 383-84 (S.D.N.Y. 2016) (holding that group pleading is insufficient and provides an
independent basis for dismissal).

*Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 235 (S.D.N.Y. 2018), *appeal filed*, No. 18-3807 (2d

Cir. Dec. 20, 2018).  It is not enough to allege that Defendants should have known of an existing

trend, event, or uncertainty; *actual knowledge* is required.  *See Plumbers & Steamfitters Local*

*137 Pension Fund* v. *Am. Express Co*., 2017 WL 4403314, at *21 (S.D.N.Y. Sept. 30,

2017), *aff'd sub nom. Pipefitters Union Local 537 Pension Fund* v. *Am. Express Co.*, 773 F.

App'x 630 (2d Cir. 2019); *see also In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *5

(S.D.N.Y. Mar. 29, 2016) (finding that "merely 'pleading a trend's *existence*' is insufficient to

establish knowledge").

      1.    <u>The Offering Documents Did Disclose Known Trends Concerning ZIV</u>

Plaintiffs' Regulation S-K claims are undone by the robust disclosures in the Offering

Documents.  As detailed at length at Section I.A., *supra*, there were no misstatements or

omissions in the Offering Documents.  *See Set Capital R&R*, 2019 WL 3940641, at *11-*12; *see*

*also Halbert*, 2019 WL 3975362, at *9; *City of Pontiac*, 752 F.3d at 184 (affirming dismissal of

Section 11 claims based on violation of Item 503 because "plaintiffs have not pleaded any

misstatements in the Offering that give rise to a cause of action under the Securities Act").  The

Offering Documents "specifically warned that hedging necessary for rebalancing at the end of

each trading day *would* 'contribute to the trading volume of the underlying futures contracts and

may adversely affect the market price of such underlying futures contracts and in turn the level

of the applicable underlying Index."  *Set Capital R&R*, 2019 WL 3940641, at *12 (emphasis

added); *accord Set Capital Order*, 2019 WL 4673433, at *4.  Moreover:

> The January Supplement further explained that Credit Suisse might adjust its
> hedging daily to account for the changes in the value of the futures contracts
> underlying the indices.  [Linken Decl. Ex. A at PS-16] ("The daily rebalancing of
> the futures contracts underlying the Indices may cause the Issuer, our affiliates, or
> third parties with whom we transact to adjust their hedges accordingly.").  The

> January Supplement explained that this daily rebalancing could adversely affect the value of the [inverse ETNs].

*Set Capital R&R*, 2019 WL 3940641, at \*6.  The Offering Documents also fully disclosed the potential impacts of liquidity issues involving the underlying futures on the value of the notes, stating that "the following factors, many of which are beyond [Credit Suisse's] control, will influence the market value of [the] ETNs, as well as the applicable Redemption Amount: . . . the liquidity of any option or futures contracts relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures . . . ."  Linken Decl. Ex. A at PS-21.  The Offering Documents detailed how "[f]utures markets like the CBOE, the market for the VIX futures, are subject to temporary distortions or other disruptions due to various factors, including the lack of liquidity in the markets, *the participation of speculators*, and government regulation and intervention . . . .  These circumstances could affect the value of the Index and therefore could adversely affect the value of your notes."  *Id.* at PS-26 (emphasis added).  Plaintiffs do not point to a single risk—trend or otherwise—that should have been disclosed and that was not included within the Offering Documents' extensive disclosures.

## 2.   *Plaintiffs Do Not Plead Actual Knowledge of Any Undisclosed Risks*

Even assuming, contrary to fact, that the Offering Documents did not adequately disclose the risks of which Plaintiffs now complain, the Complaint does not plead that any of the Defendants possessed knowledge of the allegedly undisclosed trends, uncertainties, or risk factors.  Plaintiffs have failed to identify any plausible facts indicating that Defendants were aware of any allegedly undisclosed trends or risk factors, or "that the alleged known trends existed at the time of the purported misleading statements or omissions."  *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 611 (S.D.N.Y. 2008) (dismissing Section 11 claims pursuant

to Item 303 where plaintiffs failed to allege that the trend was known at the time of the offering),
*aff'd*, 347 F. App'x 665 (2d Cir. 2009).  "To demonstrate knowledge, a plaintiff must allege facts
that raise a 'plausible inference' that the company's management was aware of a trend that
would 'materially impact' the company's financial performance."  *In re Coty Inc. Sec. Litig.*,
2016 WL 1271065, at *5 (citing *Panther Partners Inc.* v. *Ikanos Communications, Inc.*, 681 F.3d
114, 121-22 (2d Cir. 2012)); *see also In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL
1372709, at *6 (S.D.N.Y. Mar. 31, 2010) ("Knowledge of a trend is an essential element
triggering disclosure under Item 303."); *see also In re Ply Gem Holdings, Inc. Sec. Litig.*, 2015
WL 5707652, at *4-*5 (S.D.N.Y. Sept. 29, 2015) (dismissing Item 303 claim because "the
Complaint fails to plead facts sufficient to permit the conclusion that the alleged omissions were
'reasonably likely to be material' at the time of the [offering]"); Management's Discussion and
Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835,
Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC 1330
(May 18, 1989) (Item 303 imposes a disclosure duty "where a trend, demand, commitment, event
or uncertainty is . . .  presently known to management").[7]

## II.     PLAINTIFFS' CLAIMED LOSS IS NOT CAUSALLY CONNECTED TO THE ALLEGED MISREPRESENTATIONS

Plaintiffs' Section 11 claim fails for lack of loss causation between the alleged
misrepresentations and Plaintiffs' claimed loss.  To plead loss causation, "'a plaintiff must allege

---

[7]     The fact that "[i]t was public knowledge that the price of VIX futures rose disproportionately during three earlier volatility spikes … likely [because] the VIX-related ETN market had grown so large that it was impacting the value of the underlying futures" erodes Plaintiffs' claim that any allegedly omitted information was material.  *See Set Capital R&R*, 2019 WL 3940641, at *12; *see also id.* ("The fact that the Offering Documents did not relay this history was, therefore, not a material omission."); *In re IAC/Interactive Corp. Sec. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y. 2010) (dismissing Section 11 claim premised on Item 303 where alleged omission was part of "total mix" of publicly available information).  *Cf.* Compl. ¶¶ 32-34, 44-45, 50.

. . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss

suffered', *i.e.*, that the misstatement or omission concealed something from the market that,

when disclosed, negatively affected the value of the security."  *Lentell* v. *Merrill Lynch & Co.,*

*Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  While the absence of loss causation generally is an

affirmative defense to Section 11 claims (*see In re State St. Bank & Trust Co. Fixed Income*

*Funds Inv. Litig.*, 774 F. Supp. 2d 584, 593 (S.D.N.Y. 2011)), dismissal on a Rule 12(b)(6)

motion is proper where the lack of loss causation is established on the face of the complaint.  *See*

*Pani* v. *Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense

may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary

judgment procedure, if the defense appears on the face of the complaint.").

     Plaintiffs do not identify a single corrective disclosure—nor could they—that resulted in

Plaintiffs' alleged losses.  They instead seek to hold Defendants liable for an alleged undisclosed

risk that materialized and caused a foreseeable loss.  That alleged undisclosed risk concerns

alleged hedging activity by Defendants to protect themselves "in the event CS Inverse ETN

investors sought to redeem their CS Inverse ETNs."  Compl. ¶ 29.  As detailed extensively

*supra*, however, nothing about Credit Suisse's alleged hedging activity was concealed from ZIV

ETN investors.  For example, the Offering Documents made plain Credit Suisse's potential

> [T]o hedge our obligations under the ETNs through one or more affiliates. . . .
> The costs of maintaining or adjusting this hedging activity could affect the value
> of the Index, and accordingly the value of the ETNs.  Moreover, this hedging
> activity may result in our or our affiliates' receipt of a profit, even if the market
> value of the ETNs declines."

Linken Decl. Ex. A at PS-13.  Equally relevant is Credit Suisse's disclosure that the trading

activities of Credit Suisse, its affiliates, or third parties could "***influence the level of the***

***applicable underlying Index, [and] could be adverse to your interests as a beneficial owner of***

- 19 -

*your ETNs.*"  *Id.* at PS-25 (emphasis added).  There simply was no "misstatement or omission [that] concealed something from the market that, when disclosed, negatively affected the value of the [ZIV ETNs]."  *Lentell*, 396 F.3d at 173.

Moreover, the face of the Complaint establishes conclusively that Plaintiffs' alleged losses were caused by market forces entirely outside of Credit Suisse's control.  *See First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("[W]hen the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately [pled] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.").  Plaintiffs allege that on February 5, 2018, "the SPX fell approximately 4% amid concerns about rising bond yields and higher inflation," and that this spike in market-wide volatility caused a commensurate decline in the value of the ZIV ETNs.  *See* Compl. ¶¶ 47-51.  In fact, Plaintiffs state that the "market spiraled out of control in a feedback loop" and that these "market imbalances," rather than any misstatement by the Credit Suisse Defendants, "caus[ed] Plaintiffs and other similarly situated investors to suffer a significant loss."  Compl. ¶¶ 49, 51.  Plaintiffs' own allegations in their Complaint confirm that they are unable to establish any causal connection between the alleged omissions and their claimed losses.  Plaintiffs thus do not plead loss causation.  *See Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005) (observing the securities laws are not meant "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause").

### III.    PLAINTIFFS' CONTROL PERSON CLAIM FAILS AS A MATTER OF LAW

Having failed to allege a primary violation of the securities laws, Plaintiffs' claim for control person liability as to the Individual Defendants also fails.  *See supra* Sections I-II; *see*

*also Rombach* v. *Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (where "the district court properly dismissed the primary securities claims against the individual defendants, the[] secondary claims must also be dismissed").

In any event, the control person claim also fails for the additional and independent reason that the Complaint lacks any particularized allegations of culpable conduct by the allegedly controlling persons in the particular transaction at issue.  Plaintiffs allege in the most conclusory fashion that "[t]he defendants named herein each were culpable participants in the violations of Section 15 [sic] of the Securities Act alleged in the Count above."  Compl. ¶ 87.  But the Court need not credit such "[t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678; *see also In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 197 (S.D.N.Y. 2016) ("To state a claim for § 15 control person liability, plaintiffs must plead . . . that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."); *Public Emps.' Ret. Sys. of Miss.* v. *Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) ("[T]o make out a Section 15 'control person' claim (as opposed to a strict liability claim under Section 11 for someone who signed the relevant regulation statements or was a director or officer at the time), plaintiffs must also allege, to make out a Section 15 claim, 'meaningful culpable conduct [by an individual defendant] beyond mere status as a director or officer.'"); *but see In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011) (finding that whether culpable participation is required for a Section 15 claim has "divided district courts in this Circuit").

Plaintiffs ignore these pleading requirements.  Setting aside paragraphs defining the Individual Defendants as parties to the litigation (Compl. ¶¶ 9-11), the Complaint devotes a mere handful of paragraphs to Messrs. Thiam and Mathers' alleged involvement.  Two of those

paragraphs state only that both Individual Defendants signed the Registration Statement (*see id*. ¶¶ 56, 77), which Plaintiffs claim gives rise both to liability pursuant to Section 11 and Section 15.  *Compare* Compl. ¶ 77, *with* Compl. ¶ 85.  But an individual's "own alleged primary violation cannot serve as the basis of a § 15 claim against him.  Control person liability is separate from § 11 liability, and plaintiffs cannot 'double back' so that the same conduct underlies both claims."  *In re Petrobras Sec. Litig.*, 152 F. Supp. 3d at 198.

Another paragraph alleges that the "Individual Defendants were each control persons of Credit Suisse by virtue of their positions as directors or senior officers of Credit Suisse and [Credit Suisse Securities (USA) LLC]."  *Id*. ¶ 85.  These boilerplate recitations of purported control are deficient as a matter of law because allegations of corporate title—without more—are insufficient to establish control person liability.  *See Sloane Overseas Fund, Ltd.* v. *Sapiens Intern. Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) (dismissing Sections 15 and 20 claims because, *inter alia*, "[a] person's status as an officer, director, or shareholder, absent more, is not enough to trigger liability under § 20."); *cf. e.g.*, *Ellison* v. *Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 638 (S.D.N.Y. 1999) ("The same considerations that apply in the context of control person liability under the Exchange Act apply to control person liability pursuant to the 1933 Act.").

Perhaps recognizing the infirmity of these allegations, Paragraph 87 of the Complaint also alleges that the Individual Defendants "construct[ed] and manag[ed] ZIV, creat[ed] and disseminat[ed] the Registration Statement, market[ed] and [sold] ZIV or . . . otherwise participated in the process that allowed the offer and sale of ZIV to investors be successfully completed."  The Complaint, however, is devoid of a single fact-based allegation supporting the conclusions that Plaintiffs offer in Paragraph 87.  More than Plaintiffs' self-serving say-so is

Case 1:19-cv-01069-VEC   Document 35   Filed 10/21/19   Page 29 of 29

required to plead a claim for control person liability.  *See Iqbal*, 556 U.S. at 678.  Plaintiffs offer

no allegations anywhere in the Complaint tying the Individual Defendants to Credit Suisse's

hedging activities.  Plaintiffs also do not offer a single allegation in the Complaint that ties either

Individual Defendant to the construction or management of the ZIV ETNs, the creation, editing

or dissemination of the ZIV ETN Offering Documents, or any marketing or sales efforts related

to the ZIV ETNs.  Plaintiffs' allegations are woefully deficient with regard to both Individual

Defendants, and the control person claim should be dismissed.

## CONCLUSION

The Complaint should be dismissed with prejudice.


Dated:   October 21, 2019
         New York, New York

Respectfully submitted,

**CAHILL GORDON & REINDEL LLP**

By: /s/ David G. Januszewski
       Herbert S. Washer
       David G. Januszewski
       Peter J. Linken
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 259-5420
hwasher@cahill.com
djanuszewski@cahill.com
plinken@cahill.com

*Attorneys for Defendants Credit
Suisse Group AG, Credit Suisse AG,
Credit Suisse Securities (USA) LLC,
Tidjane Thiam, and David R.
Mathers*